[Nos. 31565-0-I; 30586-7-I.   Division One.   August 15, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. CARLOS LINARES, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. ISAAC LEE PAM, *Appellant.*

*Jeff Ellis* of *The Defender Association,* for appellant Linares.

*Neal J. Philip* of *Washington Appellate Defender Association,* for appellant Pam.

*Norm Maleng, Prosecuting Attorney,* and *Jennifer K. Ryan Gilman* and *Tami Perdue, Deputies,* for respondent.

[As amended by order of the Court of Appeals September 26, 1994.]

AGID, J. — Carlos Linares and Isaac Pam appeal their juvenile convictions on the grounds that the court erred in (1) considering their improperly obtained custodial statements at their capacity hearings and (2) concluding that they were capable, under RCW 9A.04.050, of committing the crimes with which they were charged.

# I
## USE OF THE IMPROPERLY OBTAINED CUSTODIAL
## STATEMENTS AT THE CAPACITY HEARINGS
### Facts

A. <u>Linares.</u>

Linares was arrested after breaking into an elementary school with two other boys. He was 11 years old at the time. Officer David Sweeney, one of the arresting officers, read Linares his *Miranda*[1] rights. Linares signed a form indicating that he understood and waived these rights and proceeded to give a statement to Sweeney admitting his involvement in the crime and acknowledging that the conduct was wrong. Linares was charged with, and ultimately found guilty of, burglary in the second degree, in violation of RCW 9A.52.030, and theft in the third degree, in violation of RCW 9A.56.050 and RCW 9A.56.020(1)(a).

B. <u>Pam.</u>

On May 26, 1991, the Renton police received a report that three boys were throwing rocks at an office building and breaking windows. One of the boys was Isaac Pam, who was 11 years old at the time. Officer Scott Phipps located the boys and read each boy his *Miranda* rights. Pam gave a

---

[1]*Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

statement to Phipps in which he admitted throwing rocks at the building. Pam was charged with, and ultimately found guilty of, malicious mischief in the first degree, in violation of RCW 9A.48.070(1)(a).

## Discussion

Because both Linares and Pam were under the age of 12 at the time of the incidents, the trial court held capacity hearings pursuant to RCW 9A.04.050 to determine whether they were capable of committing the crimes charged.[2] In both cases, the courts ruled that the statements each boy had given to the police would be admissible at their capacity hearings but not at their adjudicatory hearings because the statements were taken in violation of RCW 13.40.140.[3] In both cases, the courts found that the State had rebutted the statutory presumption of incapacity. On appeal, Linares and Pam assign error to the consideration of their improperly obtained custodial statements at their capacity hearings.[4]

Linares argues that RCW 13.40.140(8) prohibits the use of improperly obtained custodial statements at juvenile capacity hearings. That statute provides in part:

A juvenile shall be accorded the same privilege against self-incrimination as an adult. An extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding may not be received in evidence at an adjudicatory hearing over objection. Evidence illegally seized or obtained may not be received in evidence over objection at an adjudicatory hearing

[2]RCW 9A.04.050 provides that "[c]hildren of eight and under twelve years of age are presumed to be incapable of committing crime, but this presumption may be removed by proof that they have sufficient capacity to understand the act or neglect, and to know that it was wrong."

[3]That statute provides that a juvenile's waiver of the right to remain silent "must be an express waiver intelligently made by the juvenile after the juvenile has been fully informed of the right being waived." RCW 13.40.140(9). Where a juvenile is under 12 years of age, the "juvenile's parent, guardian, or custodian shall give any waiver". RCW 13.40.140(10). Neither Linares' nor Pam's rights were waived by a parent, guardian or custodian.

[4]On appeal the State argues that Linares' statement was not obtained improperly. The State did not challenge this ruling below. On the contrary, it indicated that it agreed with the court on this point. Thus, the State's objection has been waived.

to prove the allegations against the juvenile if the evidence would be inadmissible in an adult criminal proceeding.

Linares contends that the statute should be interpreted to include capacity hearings within the category of "adjudicatory" hearings. Under this interpretation, his statement would have been inadmissible at his capacity hearing.

■ We reject this argument because a capacity hearing is not an adjudicatory hearing for the purposes of RCW 13.40.140(8). Thus, the protections of that statute do not apply. Although the term is not defined in the statute, it is clear from other portions of the statute that "adjudicatory hearing" was intended to refer to proceedings in which the court determines a juvenile's guilt or innocence, not to preliminary or posttrial proceedings. See, e.g., RCW 13.40.130(3) ("[a]t the adjudicatory hearing it shall be the burden of the prosecution to prove the allegations of the information beyond a reasonable doubt"); RCW 13.40.130(7) ("following an adjudicatory hearing [the court] may request that a predisposition study be prepared to aid the court in its evaluation of the matters relevant to disposition of the case"); RCW 13.40.130(8) ("[t]he disposition hearing shall be held within fourteen days after the adjudicatory hearing or plea of guilty"). There is nothing in the statute that supports Linares' argument that the definition of adjudicatory hearing encompasses preliminary proceedings such as a capacity hearing.

Cases interpreting the former and current RCW Title 13 have also made a distinction between a hearing to determine guilt or innocence and nonadversarial proceedings in the context of deciding whether a juvenile is entitled to constitutional or statutory protections.[5] In re Harbert, 85 Wn.2d 719, 725, 538 P.2d 1212 (1975) distinguished between a juvenile declination hearing and an adult criminal prosecution on the ground that the former is not prosecutorial or adversarial in nature because it "does not result in a determination of guilt

---

[5]Cf. In re Gault, 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967) (discussing the distinction between adjudicatory stage of juvenile proceeding and postadjudication disposition stage).

. . . and does not directly result in confinement or other punishment" (quoting *State v. Piche*, 74 Wn.2d 9, 14, 442 P.2d 632 (1968)). In *Harbert*, the court held that the Rules of Evidence and the Sixth Amendment did not apply at nonprosecutorial proceedings such as a declination hearing. In *State v. Whittington*, 27 Wn. App. 422, 428-29, 618 P.2d 121 (1980), this court held that a disposition hearing at which a finding of manifest injustice is sought is an adversarial proceeding since it can result in the imposition of a higher sentence than would otherwise be permissible. The court concluded that hearsay rules and confrontation clause rights apply at such a hearing. 27 Wn. App. at 429.[6]

RCW 13.40.140(8) provides that a juvenile is entitled to "the *same* privilege against self-incrimination as an adult", not to more extensive protection of his or her Fifth Amendment rights. (Italics ours.) Thus, the statute mandates that juveniles be treated the same as adults and that evidentiary issues be resolved with reference to adult criminal proceedings. The statute further provides that "[a]n extrajudicial statement which would be constitutionally inadmissible in a criminal proceeding may not be received in evidence at an adjudicatory hearing over objection." Exclusion of illegally obtained evidence is not required in preliminary determinations in adult criminal cases.[7] It follows that use of juvenile statements obtained in violation of RCW 13.40.140(10) at a capacity hearing is not barred by RCW 13.40.140(8).[8]

---

[6]*But see State v. S.S.*, 67 Wn. App. 800, 840 P.2d 891 (1992) (calling into doubt the continuing validity of *Whittington* and holding that juvenile had no federal or state constitutional right to confront witnesses at a manifest injustice hearing).

[7]*See* ER 1101(c)(3) (Rules of Evidence need not be applied in "preliminary determinations in criminal cases" or "preliminary determinations in juvenile court proceedings under RCW Title 13"); *see also* JuCR 1.4(c) (Rules of Evidence "apply in juvenile court proceedings to the extent and with the exceptions stated in ER 1101").

[8]Linares further argues that the statement should have been suppressed under the Fifth Amendment and under *Miranda*. However, he cites no cases holding that statements taken in violation of *Miranda* may not be used in pretrial proceedings, and federal case law does not support his position. *See, e.g., United States v. Lemon*, 550 F.2d 467 (9th Cir. 1977) (statement taken in viola-

## II

### Capacity Findings

██ ██ RCW 9A.04.050 establishes a statutory presumption of incapacity where a child is between 8 and 12 years old. The statutory presumption of incapacity applies in juvenile proceedings. *State v. Q.D.*, 102 Wn.2d 19, 21, 685 P.2d 557 (1984). The State has the burden of rebutting the presumption of incapacity by clear and convincing evidence. 102 Wn.2d at 21. The standard of review on appeal is whether there was evidence from which a rational trier of fact could find capacity by clear and convincing evidence. *State v. K.R.L.*, 67 Wn. App. 721, 840 P.2d 210 (1992).

### Facts

A. Linares.

At Linares' capacity hearing, Officer Sweeney testified that Linares admitted entering the school and taking a radio. He also testified that Linares made the following statement: "I know what I did is wrong. Those things didn't belong to me. I wasn't supposed to be inside the school." Besides Sweeney's testimony, the court heard testimony from Linares, Yolanda Gonzales, Linares' teacher for 2 years, Jaynie Pleasants, a school psychologist, and James Matthews, one of Linares' former teachers. Gonzales testified that after the incident Linares told her

> that he and a friend — a cousin and his brother had gone into a school. And I asked him why. And he said because they wanted to play inside; because it was raining outside, and they wanted to go in and play ball.

She also testified that Linares told her he knew what he had done was wrong and that he took responsibility for it. She explained that Linares understands rules, but not the consequences of breaking those rules. She also testified that Linares has learning disabilities and was receiving special education at the time.

tion of *Miranda* may not be used to prove substantive facts at trial but may be used for other purposes if it satisfies legal standard of trustworthiness).

Pleasants testified that she has observed and tested Linares in conjunction with his special education requirements. He was tested in February 1991; the results of those tests showed that his verbal IQ was in the low-average range and his performance IQ was slightly above the mean for his age.[9] She concluded that Linares "has a lot of difficulty processing and getting into long-term memory things". She also testified that, on a comprehension subtest designed to measure a child's understanding of cultural and social information, Linares scored below a 7-year-old level. Pleasants concluded that Linares may understand that "criminals . . . do wrong things", but he would not understand that they actually broke the law or what the consequences of doing so were. In her opinion, Linares did not have the capacity to understand the crimes with which he was charged.

Matthews was Linares' teacher when he was in the second grade and had seen him almost every day since at school. He described Linares as an "agreeable" person who "doesn't want to go against what the other kids are doing". He testified that the fact Linares is bilingual has made it harder for him to learn.

Linares testified at the capacity hearing. He was asked a series of questions by his attorney about his understanding of his rights and the criminal justice system. To each question asked he simply replied "no". The State asked only a few questions on cross examination. The trial court found that the State had met its burden of rebutting the statutory presumption of incapacity. It further stated that, even if it had not considered Linares' statement to Officer Sweeney, it was still led to conclude that the State had met its burden because the remaining evidence was clear, cogent, and convincing that Linares had the capacity to understand it was wrong both to enter a locked school and to take things.

---

[9]Pleasants explained that verbal IQ relates to information learned through auditory processing and performance IQ relates to visual/spatial information.

B. Pam.

At Pam's capacity hearing, Officer Phipps testified that he asked Pam if he knew why he was being stopped. Pam replied that "he believed that it was in regards to . . . throwing rocks at a building". Phipps further testified that they

> first discussed who was throwing the rocks and how many rocks were thrown, and he had indicated that he had also thrown rocks at the same building the day before, on, I believe it was, the 25th, and had broken out some windows, both — both this day and the day before.
>
> When we finished discussing that, I asked him if he realized his actions were wrong; he stated that he did realize that. We talked about did he think he was going to get in trouble from his parents; he stated yeah, he was going to be in trouble, and he knew when he was doing it that is was something that he could get in trouble for. I also — we discussed the fact that there are laws in our state, and did he realize that it was against the law to break windows, and he said that he did understand that.

Pam did not testify at the capacity hearing and the State did not present any witnesses besides Phipps.

## Discussion

Linares argues that the State did not rebut the statutory presumption of incapacity because it did not establish that he appreciated the quality of his acts at the time he committed them or that he understood the consequences of his acts. He contends that the concept of wrongfulness as used in the context of a juvenile's capacity to commit a crime must include the requirement that the juvenile understand the basic legal prohibition against such action. He also argues that, although the evidence may have shown that he knew his actions were morally wrong, there was no evidence to show that he knew his actions were legally prohibited.

In addressing this issue, we find it instructive to refer to cases interpreting the insanity defense. *See* RCW 9A.12.010. Although not perfectly analogous, the insanity and infancy defenses have similar origins and functions in the criminal law. Both belong to a class of defenses that focus on the actor's lack of capacity to form the mens rea of a crime. If the actor lacks that capacity, he or she is legally incapable of

committing the crime and for that reason is relieved of all criminal responsibility for the act. *See In re Devon T.*, 85 Md. App. 674, 678, 584 A.2d 1287, 1289 (1991).

The wording of the insanity statute is similar to that of the infancy statute and the case law interpreting the former assists us in our analysis of the latter. To establish an insanity defense, the defendant must show that he or she was suffering from a mental disease or defect. RCW 9A.12.010(1). Once a mental disease or defect is established, the defendant must establish that, as a result of that mental disease or defect, he or she was either (1) unable to perceive the nature and quality of the act charged or (2) unable to tell right from wrong with reference to that act. RCW 9A.12.010(1)(a), (b). Under the infancy statute, the State must show that the child had sufficient capacity both to (1) understand the act or neglect charged and (2) understand that it was wrong. RCW 9A.04.050. Apart from the requirement under the insanity defense that an actor suffer from a mental disease or defect, the differences between the statutes are procedural rather than substantive.[10] Ultimately, both are concerned with the actor's ability to appreciate the nature of the act and its wrongfulness. Here we are concerned only with the portion of the infancy statute that addresses the child's knowledge that the act was wrong. We interpret the requirement under RCW 9A.04.050 that a child "know [the act or neglect] was wrong" to have essentially the same meaning as the requirement under RCW 9A.12.010(1)(b) that a defendant be "unable to tell right from wrong with reference to the particular act charged".

In *State v. Crenshaw*, 98 Wn.2d 789, 792-800, 659 P.2d 488 (1983), the Supreme Court considered the concept of "wrong" in the context of sanity determinations. Linares contends that *Crenshaw* stands for the proposition that a person's apprecia-

---

[10]Sanity is presumed, *State v. McDonald*, 89 Wn.2d 256, 571 P.2d 930 (1977), and a defendant bears the burden of proving insanity by a preponderance of the evidence. RCW 9A.12.010(2). In contrast, where a child is between the ages of 8 and 12, incapacity is presumed, RCW 9A.04.050, and the State has the burden of rebutting that presumption by clear and convincing evidence. *Q.D.*, 102 Wn.2d at 21.

tion of the wrongfulness of his or her conduct must include, at a minimum, the knowledge that the act is contrary to law. In *Crenshaw*, the trial court had instructed the jury that "[w]hat is meant by the terms 'right and wrong' refers to knowledge of a person at the time of committing an act that he was acting contrary to the law." 98 Wn.2d at 793. The Supreme Court concluded that insanity defense instructions should not elaborate on this point, but found that the error was harmless in that case. 98 Wn.2d at 805.[11] The court reasoned that leaving the term "wrong" undefined permits "both parties to argue their theories of the case [and] . . . prevent[s] the possibility that the jury [will] presume that ignorance of the law is a defense in cases wherein it may not be . . . clear . . . that the person knew the illegality of his act." 98 Wn.2d at 805. Thus, in the context of sanity determinations, the Supreme Court has rejected a test that relies on a defendant's understanding of the legal prohibition and legal consequences of that conduct as the sine qua non for determining whether he or she appreciates the wrongfulness of the conduct. Likewise, we decline to do so in the context of juvenile capacity determinations.

■ We do read *Crenshaw* to support the proposition that the nature of the crime is relevant in determining whether a person appreciates the wrongfulness of his or her act. The court there noted that, in the context of the insanity defense, most crimes will be ones "for which society's moral judgment is identical" to the applicable legal standard. 98 Wn.2d at 799. Consequently, "as a practical matter, the way in which a court interprets the word 'wrong' will have little effect on the eventual outcome of a case." 98 Wn.2d at 799. The same holds true in the juvenile context. This is especially so in the cases before us where the acts, breaking into a school and stealing property and breaking windows, are ones which are generally perceived as morally wrong.[12]

---

[11]Although the basis of the court's disposition of the case is not entirely clear because it relied on alternative holdings, it is clear from the opinion that it did not approve the instruction given.

[12]To the extent that society's moral judgment does not necessarily coalesce with its legal standards, the nature of the charged crime is relevant to the eval-

■ Capacity determinations, by their nature, are fact-specific inquiries and must be determined on a case by case basis. In addition to the nature of the crime, the following factors are relevant in determining whether a child knew the act he or she was committing was wrong: (1) whether the child evinced a desire for secrecy, (2) the child's age, *Q.D.*, 102 Wn.2d at 27,[13] (3) prior conduct similar to that charged, (4) any consequences that attached to that conduct, and (5) acknowledgment that the behavior is wrong and could lead to detention. *State v. S.P.*, 49 Wn. App. 45, 47, 746 P.2d 813, (1987), *rev'd on other grounds*, 110 Wn.2d 886, 756 P.2d 1315 (1988).

We conclude that there was sufficient evidence presented in Linares' case to enable a rational trier of fact to find capacity by clear and convincing evidence. In addition to Linares' statement to Officer Sweeney, the court considered his statement to Gonzales and the testimony of Linares' teachers and a school psychologist regarding his level of maturity and intellectual development. Although some of these witnesses felt Linares did not understand the legal prohibitions against his acts, none testified that he did not understand that his conduct was wrong. The court was also able to observe Linares' demeanor when he took the stand at the hearing. Linares' conduct during and after the break-in is also highly probative in establishing that he appreciated the wrongfulness of his conduct.[14] The finding of capacity is further supported by the fact that Linares was 11 years old

uation of a child's appreciation of the wrongfulness of his or her conduct. The more intuitively obvious the wrongfulness of the conduct, the more likely it is that a child is aware that some form of societal consequences will attach to the act. By way of example, a lesser amount of evidence may be required to rebut the presumption that a child does not appreciate the wrongfulness of stealing than to rebut the presumption where certain sexual offenses are involved. That issue, however, is not before us and we do not decide it here.

[13] In *Q.D.*, the court considered the fact that one of the defendants was less than 3 months shy of the age at which capacity is presumed to exist.

[14] Upon seeing police, Linares dropped a radio he was carrying. At the police station he lied to Sweeney, claiming that stolen items found on his person were his belongings.

at the time of the incident, the upper end of the age range in which a child is presumed incapable of committing a crime. *See Q.D.*, 102 Wn.2d at 27.

The State did not meet its burden in Pam's case. Apart from the fact that Pam was 11 years old at the time of the incident, there was no other evidence presented at the hearing besides his custodial statement on which the court could have based its capacity finding. Pam did not testify at the hearing, and the court did not have an opportunity to observe his demeanor. The court did not hear testimony from any other witness besides Officer Phipps. Although in his statement to Phipps following the incident Pam acknowledged that his actions were wrong, that is insufficient evidence from which a rational trier of fact could have concluded that Pam appreciated the wrongfulness of his act *at the time* it was committed.[15]

■ In *State v. K.R.L.*, 67 Wn. App. 721, 725, 840 P.2d 210 (1992), the court held a juvenile's statement to his mother admitting the wrongfulness of his conduct was insufficient to support the finding of capacity. The juvenile in that case was 8 years old, and his statement was made only after he had been beaten by his mother. The court reasoned that K.R.L.'s statement did not establish that he knew what he did was wrong at the time of the act because after he had been beaten

> he undoubtedly came to the realization that what he had done was wrong. We are certain that this conditioned the child, after the fact, to know that what he did was wrong. That is a far different thing than one['s] appreciating the quality of his or her acts at the time the act is being committed.

67 Wn. App. at 725. To the extent that Pam's statements did not establish his appreciation of the wrongfulness of his conduct at the time it was committed, this case is similar to *K.L.R.* Although Pam was not beaten like K.L.R., once the children were separated and given *Miranda* warnings it

---

[15]*See State v. K.R.L.*, 67 Wn. App. 721, 725, 840 P.2d 210 (1992) (the relevant inquiry is whether the child appreciated "the quality of his or her acts at the time the act" was committed).

must have been obvious to Pam that he had done something wrong. Furthermore, when the police showed up, the children did not try to hide what they had done, lie, or otherwise evidence a desire for secrecy. Nor had they suffered any consequences from the similar behavior the day before, acts which Pam readily admitted. We hold that a child's after-the-fact acknowledgment that he or she understood that the conduct was wrong is insufficient, standing alone, to overcome the presumption of incapacity by clear and convincing evidence.

The disposition in *Linares* is affirmed and the disposition in *Pam* is reversed.

PEKELIS, A.C.J., and GROSSE, J., concur.

After modification, further reconsideration denied September 26, 1994.