954 P.2d 894 (1998)
135 Wash.2d 34
STATE of Washington, Petitioner,
v.
J.P.S., Respondent.
No. 65439-5.
Supreme Court of Washington, En Banc.
Argued January 28, 1998.
Decided April 23, 1998.
*895 Jeffrey Sullivan, Yakima County Prosecutor, Lauri Boyd, Deputy County Prosecutor, Yakima, for Petitioner.
Hugh Spall Jr., Ellensburg, for Respondent.
GUY, Justice.
In this case, we are asked to review a superior court's conclusion that a child had the capacity to commit an offense which, if committed by an adult, would be a crime. We are also asked to clarify what the State must prove in order to overcome the statutory presumption that a young child is incapable of committing a crime.
The State charged 11-year-old J.P.S. (hereafter J.P.) with rape of a child in the first degree in violation of RCW 9A.44.073. The charge was based upon an alleged act of intercourse between J.P. and his three-year-old playmate, M. Because J.P. was under the age of 12 at the time of the alleged offense, the superior court held a capacity hearing to determine whether he was capable of committing the crime charged. RCW 9A.04.050. The trial court found, in spite of the fact that J.P. was mentally retarded, that he had the capacity to understand the prohibited act and its wrongfulness and could be tried for the offense of first degree rape of a child.
The Court of Appeals accepted discretionary review of the capacity determination prior *896 to any determination on guilt and reversed the finding of capacity, holding the evidence was insufficient to rebut the statutory presumption of incapacity. State v. James P.S., 85 Wash.App. 586, 934 P.2d 698 (1997). We affirm the Court of Appeals decision in this case but clarify that it is not necessary for the State to prove that a child understands the illegality or the legal consequences of an act in order to prove capacity. The inquiry is whether the child had sufficient capacity to (1) understand the act and (2) know that it was wrong.
At common law, children below age 7 were conclusively presumed to be incapable of committing a crime and children over the age of 14 were presumed to be capable. Children between those ages were rebuttably presumed incapable of committing a crime. State v. Q.D., 102 Wash.2d 19, 22-23, 685 P.2d 557 (1984); Andrew Walkover, The Infancy Defense in the New Juvenile Court, 31 U.C.L.A. L. Rev. 503 (1984). Washington codified these presumptions, changing the age of incapacity to 7 and younger and the age of presumed capacity to 12 and older. RCW 9A.04.050 provides, in pertinent part, that children between the ages of 7 and 12 are presumed incapable of committing a crime:
Children under the age of eight years are incapable of committing crime. Children of eight and under twelve years of age are presumed to be incapable of committing crime, but this presumption may be removed by proof that they have sufficient capacity to understand the act or neglect, and to know that it was wrong.
This statute applies to juvenile adjudications, and the State has the burden to rebut the presumption of incapacity by clear and convincing evidence. Q.D., 102 Wash.2d at 21, 26, 685 P.2d 557; State v. K.R.L., 67 Wash.App. 721, 724, 840 P.2d 210 (1992). The standard of review on appeal is whether there was evidence from which a rational trier of fact could find capacity by clear and convincing evidence. K.R.L., 67 Wash.App. at 724, 840 P.2d 210; State v. Linares, 75 Wash.App. 404, 410, 880 P.2d 550 (1994).
A capacity determination must be made in reference to the specific act charged. Q.D., 102 Wash.2d at 26, 685 P.2d 557; see also K.R.L., 67 Wash.App. at 726, 840 P.2d 210. The legal test is whether J.P. had knowledge of the wrongfulness of the act at the time he committed the offense and not that he realized it was wrong after the fact. E.g., K.R.L., 67 Wash.App. at 725, 840 P.2d 210. Capacity must be found to exist separate from any mental element of the offense. Capacity is not an element of the crime; rather it is a general determination that the child understood the act and its wrongfulness. Q.D., 102 Wash.2d at 24, 685 P.2d 557.
In the instant case, the Court of Appeals concluded that the State must prove the child not only understood the nature of the act and that it was wrong, but also that it was punishable in court. James P.S., 85 Wash.App. at 593, 934 P.2d 698; see also State v. Erika D.W., 85 Wash.App. 601, 606, 934 P.2d 704 (1997). We disagree. The statute requires that a child have "sufficient capacity to understand the act or neglect, and to know that it was wrong" in order to rebut the presumption of incapacity. RCW 9A.04.050. It does not require that the child know the act was illegal or understand the legal consequences of the act. The Legislature has chosen to frame the test as a capacity to understand the conduct was wrong. We decline to add to the statute the requirement that the State prove the child understood the act was "illegal." We do emphasize that the nature of the offense charged is an important factor to be considered when determining the capacity of a child. When a child is accused of a crime which involves sexual misconduct, it is more difficult for the State to prove the child understood the conduct was wrong. It is very difficult to tell if a young child, particularly one who is developmentally disabled, understands the prohibitions on sexual behavior with other children.
Therefore, the question in this case is whether there is clear and convincing evidence introduced at the capacity hearing that J.P. understood the act of sexual intercourse and knew it was wrong at the time the alleged conduct occurred. The following *897 factors may be relevant in determining whether a child knew the act he or she committed was wrong: (1) the nature of the crime; (2) the child's age and maturity; (3) whether the child showed a desire for secrecy; (4) whether the child admonished the victim not to tell; (5) prior conduct similar to that charged; (6) any consequences that attached to the conduct; and (7) acknowledgment that the behavior was wrong and could lead to detention. Linares, 75 Wash.App. at 415, 880 P.2d 550; Erika D.W., 85 Wash.App. at 605, 934 P.2d 704. Also relevant is testimony from those acquainted with the child and the testimony of experts. See Linares, 75 Wash.App. at 415, 880 P.2d 550; K.R.L., 67 Wash.App. at 722-23, 840 P.2d 210. A child's age, maturity, experience, and understanding may all be relevant in deciding if a given child had knowledge of the act's wrongfulness at the time it was committed. See In re Paul C., 221 Cal.App.3d 43, 270 Cal.Rptr. 369, 374 (1990); In re Gladys R., 1 Cal.3d 855, 83 Cal.Rptr. 671, 678, 464 P.2d 127 (1970).
Testimony at the capacity hearing in this case showed that J.P. is a mentally retarded child who tested at the level of a first grader and had limited cognitive skills. At that hearing, testimony was offered by the alleged victim's (M.'s) father; a sergeant of the Selah Police Department; the assistant principal at J.P.'s school; J.P.'s fifth grade teacher; a probation officer for Yakima County; and J.P.'s mother.
The alleged victim's father testified that his 5-year-old son and 3-year-old daughter were playing in the yard with their neighbor, J.P., when the son reported that his sister, M., and J.P. were playing in a shed some distance from the house. The father testified that when he entered the shed, M. had the top of her bathing suit pulled down and that J.P.'s pants were unfastened. He told J.P. to leave and took his daughter to his wife who examined her and, finding no evidence of trauma, did not take her to the doctor. He stated that M. told him that J.P. had asked her to take her clothes off and that he had touched her on the vagina.
M.'s father notified the police. The investigating officer talked with J.P. three times. He reported J.P. appeared a little nervous when he first talked with him on the evening of the incident. The officer told J.P. he was investigating a crime to do with M. J.P. first said he had not seen M. that evening but then said he had been playing with her and her brother. He said that M. had been dressed. The officer told J.P. that it was "against the law to lie to a police officer and that he could be arrested for obstructing if he was." Report of Proceedings at 37. The officer testified that M.'s five-year-old brother had told another officer that he had been looking for J.P. and M. and had entered the shed, and that J.P. had pulled up his pants and had told him to leave. M.'s brother then told his father that J.P. and M. were in the shed.
Approximately a month later, the officer again met with J.P. and read him his Miranda[1] warnings. He testified that J.P. appeared nervous and they only had a brief conversation without any factual information about the event. About a week later, the officer again interviewed J.P. at police headquarters and again read J.P. the Miranda warnings.[2] After J.P.'s mother left the room, J.P. made a taped statement in which he admitted M. took off her clothes, he pulled down his pants, and he touched M.'s vagina with his finger and slighted penetrated her vagina with his penis for "half a second." Transcript of Statement at 5-6. J.P. stated at the end of the statement that "I'm sorry for what I done, I know it was bad and I feel real guilty about it." Transcript of Statement at 7.
J.P.'s fifth grade teacher testified that she had J.P. in her class for approximately half of the day and that he attended special education classes for three periods a day. She testified that when she taught him, she taught material that would be equivalent to a first or second grade level. She stated that he had been taught first grade material from *898 first through the fifth grade and still remained at the first grade level. She testified that J.P. was not a discipline problem. She stated that if J.P. was taught things in repetition, he could eventually attain a concept. The teacher testified that the assistant principal had taught the human sexuality class to the boys in her fifth grade class during the year that J.P. was in the fifth grade. She stated that only physiology and anatomy were taught and not the "appropriateness" of sexual behavior.
The assistant principal testified that he did teach a one-week class to fifth graders regarding human reproduction but not the social interaction dealing with boy/girl relationships. He testified that he had never had an occasion to teach J.P. or had a class with him. He testified that on tests in the areas of vocabulary, word recognition, reading comprehension, math concepts, problem solving, math computation, spelling, language, science, social studies, total reading, total math, total language, and total battery, J.P. scored at the first grade level. He testified that J.P. was able to converse and was polite and friendly. He stated that the psychological reports indicated that J.P. had limited cognitive skills and that he was mildly mentally retarded.
A Yakima county probation officer interviewed J.P. for an "underage referral" and directed her report to the prosecutor's office. She testified that she felt J.P. did understand the terms penis and vagina, but that he did not understand what rape meant and did not understand whether the act was right or wrong. She specifically stated that she did not think at the time J.P. allegedly committed the act with M. that he knew what he was doing was wrong. Her opinion was that J.P. did not begin to understand that what he was doing was wrong until M.'s father came into the shed and ordered him to leave. She testified that during the interview J.P. at times would appear to be mentally at age 11 and then his level would appear to be that of a 3-year-old, and that he appeared to have a hard time concentrating.
J.P.'s mother testified that she did not believe J.P. knew at the time that what he was doing was wrong. She testified that he could not read or write, and that he had been in special education since he had started school and that he only learned things after much repetition. She testified that although she had taught J.P. to cover himself when getting out of the bath, she had never taught him about sexuality because he had never shown any interest and that he plays and acts at a younger level than his age. She testified that often at school he was elsewhere than in the regular curriculum, and that she did not know whether he ever attended any sexual education or "good touch, bad touch" classes from the first through the fifth grade. She testified there had been some sexual education for sixth graders which she thought had confused J.P.
The court concluded the State had met its burden of rebutting the presumption of incapacity and held that J.P. could be tried for first degree rape of a child. The Court of Appeals reversed the finding of capacity. The appeals court noted that the probation officer had concluded J.P. did not understand what rape meant or that it was wrong, that his teacher and assistant principal had testified that the reproductive process and inappropriate touching were taught at school but they did not testify that J.P. had attended these lessons in light of the fact that he was removed from regular classes half of each school day. The Court of Appeals concluded it was not clear that J.P. understood his conduct manifested sexual intercourse. It was noted that the fact that J.P. was mentally retarded added to the difficulty of proving he understood the wrongfulness of his conduct. The appeals court concluded that although J.P. had acknowledged in his statement that what he had done was "bad," the statement was made after he had been repeatedly accused of a crime by the police. The court concluded the State had not met its burden to rebut the presumption of incapacity. We agree.
After a complete review of the record, we conclude the Court of Appeals is correct that the trial court's finding that J.P. attended sex education classes is not supported by the record. While most students in the regular curriculum did attend "good touch, bad touch" classes, there was no evidence that *899 J.P. ever attended any of those classes. The testimony was that J.P. was in a "pull-out model" in which he was taken out of regular classes for approximately half of each day and placed in special education classes. There is no evidence that there was any sex education taught in the special education classes. The evidence indicates that J.P. did not attend the sex education classes in his fifth grade year. His teacher testified that the assistant principal taught the human sexuality class to the fifth grade boys during that year, and the assistant principal could not recall ever having had a class with J.P. While J.P. may have attended some sex education classes, there was no evidence in the record that he did so. Even if he had attended some classes, his teacher's and his mother's testimony was that he learned concepts only after much repetition.
Consideration of the factors which have been approved by Washington courts to determine if a child understands the wrongfulness of conduct provides little support for the conclusion that J.P. knew at the time of the alleged offense that his conduct was wrong. The nature of the act was sexual intercourse. It is very difficult to tell if a young child, particularly one who is developmentally disabled, understands the prohibitions on sexual behavior with other children. Several decisions have correctly recognized that it may be more difficult to prove that a child understood a sexual offense than a crime such as stealing or setting a fire. See Linares, 75 Wash.App., at 414, n. 12, 880 P.2d 550; State v. J.F., 87 Wash.App. 787, 790, 943 P.2d 303 (1997); Erika, 85 Wash.App. at 607, 934 P.2d 704. Most young children are taught very young not to steal or set fires or injure other people, but often young children have little, if any, instruction regarding prohibitions on sexual conduct. While J.P. was 11 years old at the time of the alleged crime, his maturity level was much lower. J.P. did show some desire for secrecy or privacy when he sent M.'s brother away, and he did at first tell the officer that M. had remained dressed while they played. However, there is no evidence that J.P. admonished M. not to tell about what happened. There is no evidence that J.P. had ever engaged in any similar conduct in the past or had ever been punished for any inappropriate sexual behavior. The record shows J.P. had never had any prior contact with the police and was not considered to be a discipline problem at school. While he did acknowledge his conduct was "bad" and that he felt guilty, this admission was only made after he was repeatedly interrogated by the police, given repeated Miranda warnings and had been shunned by his neighbors and classmates. The recognition of wrongful conduct made by a child after the child has been taught that his or her conduct was wrong is not particularly probative of whether the child understood conduct was wrong at the time it occurred. A child's after-the-fact acknowledgment that he or she understood the conduct was wrong is insufficient, standing alone, to overcome the presumption of incapacity by clear and convincing evidence. K.R.L., 67 Wash.App. at 725, 840 P.2d 210; Erika D.W., 85 Wash.App. at 606, 934 P.2d 704; J.F., 87 Wash.App. at 793, 943 P.2d 303.
The record reflects no prior training or education of J.P. about sexually prohibited behavior. It shows J.P. had never previously been in trouble for any sexually inappropriate conduct. Further, it shows that J.P. has limited cognitive ability and generally functions at the level of a first grader.
We agree with the Court of Appeals that the State failed to show by clear and convincing evidence that J.P. understood the act of sexual intercourse or that it was wrong. We affirm the Court of Appeals holding which reversed the finding of capacity.
DURHAM, C.J., and DOLLIVER, SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE and SANDERS, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).
[2] Whether J.P.'s statement would be admissible in a guilt determination proceeding is not at issue.