IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32956-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| R.C.,† | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — R.C. appeals his adjudication of three counts of assault,

committed when he was 10 years old, challenging the trial court's finding of capacity and

arguing that his lawyer's failure to assert self-defense constituted ineffective assistance of

counsel. Because the trial court's finding of capacity was supported by substantial

evidence and his lawyer's representation was not deficient, we affirm.

FACTS AND PROCEDURAL BACKGROUND

R.C. was charged with one count of second degree assault and two counts of

fourth degree assaults committed in September 2014. At the time of the assaults, R.C.

was 10 years and 7 months old. The victim of the second degree assault was R.C.'s aunt.

---

† For purposes of this opinion, the juvenile's initials are used in place of his name.

The victims of the fourth degree assaults were his mother and his great-aunt.

Since children R.C.'s age are presumed to lack the capacity to commit a crime, the first order of business in R.C.'s case was a capacity hearing. The presumption that a 10-year-old child is incapable of committing a crime may be removed by "proof that they have sufficient capacity to understand the act [charged] . . . and to know that it was wrong." RCW 9A.04.050.

The only witness called at R.C.'s capacity hearing was Steven Driscoll, a juvenile probation officer whose job duties include investigating and opining on the capacity of children under the age of 12 who are charged with crimes in Yakima County. Mr. Driscoll learned from R.C.'s mother that he had engaged in physical fights with her from age 5 or 6, which she and Mr. Driscoll attributed to R.C.'s history with his very abusive father. Before 2014, R.C.'s mother had called Yakima police "two or three times" when R.C. assaulted her. Report of Proceedings (RP) at 28. No formal action was taken in those instances, although the officers talked to R.C. about how his behavior could lead to legal issues and jail.

In 2014, R.C.'s mother moved with him to Montana, hoping that getting him away from his father might give R.C. a fresh start. But R.C. assaulted her twice during the several months they lived in Montana before returning to Yakima. Mr. Driscoll spoke with the probation officer assigned to oversee R.C. in Montana. She told Mr. Driscoll that given R.C.'s age, he had been granted diversion in both cases but had faced a definite

2

prospect of being sent to a juvenile detention facility on the second occasion, and "he was definitely afraid of it." RP at 25.

Mr. Driscoll learned from R.C.'s mother that he had been diagnosed with post-traumatic stress disorder and oppositional defiant disorder,[1] and was being treated for the disorders with Prozac and counseling. R.C. was also taking melatonin to help him sleep.

From Mr. Driscoll's testimony, his report, and the police reports admitted into evidence, the court found that R.C. had the capacity to understand the acts charged and that they were wrong. The court relied both on aspects of the assaults revealed in the police reports and on R.C.'s history with law enforcement in Yakima and Montana. The court noted that because R.C. "understands what he is doing is wrong" he "might be a kid that could really benefit from some services" available in the juvenile justice system. RP at 40-41.

At the adjudication hearing that took place thereafter, the State called the two

---

[1] Oppositional Defiant Disorder is a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months . . . and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper . . . , arguing with adults . . . , actively defying or refusing to comply with the requests or rules of adults . . . , deliberately doing things that will annoy other people . . . , blaming others for his or her own mistakes or misbehavior . . . , being touchy or easily annoyed by others . . . , being angry and resentful . . . , or being spiteful or vindictive . . . .
AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS § 313.81, at 100 (4th rev. ed. 2000).

police officers who responded to the September assaults and the three victims. The evidence established that the initial event precipitating R.C.'s assaults was his great-aunt telling him to give her a television remote that he had taken in order to change the channel from the cartoons his three-year-old sister was watching. When his great-aunt reached for the remote, R.C. punched her in her right arm, which was in a sling following surgery. He then raised his legs and kicked her in the stomach as if to push her away.

After suffering the assault, R.C.'s great-aunt told his mother, "[H]e's all yours," and went outside, crying. RP at 86. R.C.'s mother told him it was wrong to hit others, that he needed to respect his elders, and that he was grounded from watching television and could not have the remote. R.C. then punched his mother in the stomach. She ordered R.C. to take a time-out and went outside where she sat down with her sister, who was commiserating with R.C.'s great-aunt. R.C. went to a corner of the yard where he goes to calm down.

After 5 or 10 minutes, R.C. approached his mother, great-aunt and aunt, apologized for being "mouthy," and hugged his mother and great-aunt. RP at 121. But in the conversation that ensued, R.C.'s mother told him he needed to do his homework and his chores, and he again became angry. When his aunt weighed in, telling him he needed to do as he was told, R.C. told her and his mother that he "wasn't going to f—king do anything," at which point his aunt pulled the bucket on which he was sitting out from under him, causing him to fall on the ground, and told him, "[Y]ou get off your ass,

4

you get in the house, and you do your chores." RP at 123.

R.C. went into the house, but instead of undertaking chores or homework, he went into his mother's room, where his mother feared he was going to destroy things. His aunt was also afraid that R.C. "was going to do something stupid," so she went inside and told R.C., who was sitting on his mother's bed, that he needed to go outside. Ex. B at 1. When he refused, persistently, the two argued, and his aunt went outside to tell his mother he would not listen.

A few minutes later, R.C.'s aunt tried again to get him to obey. She stood in the doorway of her sister's room and told R.C. to go outside as he was told. She and R.C. yelled and swore at one another, with R.C. saying, at one point, "the next person that touches me or says anything to me is . . . going to get their ass beat or get killed." RP at 127. When R.C.'s aunt finally entered the room and reached for his arm to pull him off the bed, R.C. reached behind his back, where he had a small paring knife, grabbed it, and raised it over his head—according to his aunt, "like he was coming at [her]." RP at 131. She fled the room and called police. She testified that she feared he was going to stab her; that "If I had not moved, I probably would have gotten it right in the side." RP at 133.

At the conclusion of the evidence, the trial court announced it found the evidence "very credible on all three counts." RP at 168. While observing that it is "a very sad case," it found R.C. guilty as charged. *Id.* On the two counts of fourth degree assault, it

5

committed him to a total of 36 days of detention—the time he had already served. It committed him to the custody of the Juvenile Rehabilitation Administration for institutional placement for 15 to 36 weeks on the second degree assault, stating "that's appropriate to give him the longest shot he could get there to get the kind of help that he needs." RP at 179.

R.C. appeals.

## ANALYSIS

R.C. argues on appeal that the State failed to overcome the presumption that he was incapable of committing a crime. He also argues his trial lawyer provided ineffective assistance of counsel by not asserting self-defense. We address his contentions in turn.

### *I. Capacity*

RCW 9A.04.050 provides that children under the age of eight years are incapable of committing a crime and, relevant here, that

> [c]hildren of eight and under twelve years of age are presumed to be incapable of committing crime, but this presumption may be removed by proof that they have sufficient capacity to understand the act [charged] . . . and to know that it was wrong.

"The purpose of the presumption is to protect from the criminal justice system those individuals of tender years who are less capable than adults of appreciating the wrongfulness of their behavior." *State v. Q.D.*, 102 Wn.2d 19, 23, 685 P.2d 557 (1984).

6

The State must overcome the presumption of an 8 to 12 year old's lack of capacity with clear and convincing evidence. *State v. J.P.S.*, 135 Wn.2d 34, 37, 954 P.2d 894 (1998). Clear and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).

"A capacity determination must be made in reference to the specific act charged." *J.P.S.*, 135 Wn.2d at 37. To have capacity, the child must know the act charged was wrong at the time he committed it. *Id.* at 37-38. "A 'sense of moral guilt alone, in the absence of knowledge of legal responsibility, is not sufficient,' although actual knowledge of the legal consequences is not necessary." *State v. Ramer*, 151 Wn.2d 106, 115, 86 P.3d 132 (2004) (quoting 43 C.J.S. *Infants* § 197 (1978)). Courts consider seven factors to determine whether a child knew the act charged was wrong:

> (1) the nature of the crime; (2) the child's age and maturity; (3) whether the child showed a desire for secrecy; (4) whether the child admonished the victim not to tell; (5) prior conduct similar to that charged; (6) any consequences that attached to the conduct; and (7) acknowledgment that the behavior was wrong and could lead to detention.

*J.P.S.*, 135 Wn.2d at 38-39.

Where, as here, the trial court finds a child has capacity to commit a crime, we review the record to determine whether substantial clear and convincing evidence was presented from which the trial court could reasonably find that the statutory presumption was overcome. *Ramer*, 151 Wn.2d at 112-13. "Substantial evidence exists where there is

7

a sufficient quantity of evidence in the record to persuade a fair-minded, rational person

of the truth of the finding" at issue. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313

(1994).

We track the seven factors in our review.

*Nature of the crime.* The nature of the crime is relevant to determining the child's

ability to understand that the conduct was wrong. "The more intuitively obvious the

wrongfulness of the conduct, the more likely it is that a child is aware that some form of

societal consequences will attach to the act." *State v. Linares*, 75 Wn. App. 404, 414-15

n.12, 880 P.2d 550 (1994). Courts recognize that children are less likely to understand

the wrongfulness of a crime that is sexual in nature because "young children have little, if

any, instruction regarding prohibitions on sexual conduct." *J.P.S.*, 135 Wn.2d at 43. By

contrast, because most children "are taught very young not to steal or set fires or injure

other people," they are more likely to understand that those actions are wrong. *Id.*

The crimes charged in this case are assaults, the wrongfulness of which is

intuitively obvious. Children are almost always taught from a very young age that hitting

someone is wrong. The same is true of threatening to injure someone with a weapon.

This factor weighs in favor of finding capacity.

*Age and maturity.* R.C. committed the assaults when he was 10 years and 7

months old. R.C. and amici argue that R.C.'s past history of abuse and mental health

disorders show that he is not as mature as an average 10-year-old child, but there is no

8

evidence to that effect in the record. *Cf. State v. J.F.*, 87 Wn. App. 787, 792, 943 P.2d

303 (1997) (notwithstanding mother's testimony that child's attention deficit disorder

caused him to act impulsively, court found it to have no bearing absent evidence that the

disorder caused him to function at a lower cognitive level). It sometimes is contended

that childhood adversity ages a child beyond his years.

Alternatively, R.C. argues the court found his maturity was "right on for a 10 year

old," RP at 46; RCW 9A.04.050 presumes that a 10-year-old child lacks capacity; ergo,

he lacks capacity. The problem with this circular argument is that when we review the

seven factors to determine whether, because a child has sufficient capacity to understand

the act and know that it was wrong, the presumption does not apply.

Properly analyzed, the "age and maturity" factor recognizes, in part, that the closer

a child is to being 12 years old, the more likely he has the capacity to understand the

wrongfulness of his actions. *See Q.D.*, 102 Wn.2d at 27 ("the defendant was less than 3

months from the age at which capacity is presumed to exist"); *Linares*, 75 Wn. App. at

415-16 (capacity was supported by the fact that child was "11 years old at the time of the

incident, the upper end of the age range in which a child is presumed incapable of

committing a crime); *State v. K.R.L.*, 67 Wn. App. 721, 726, 840 P.2d 210 (1992) ("Here,

we have a child of very tender years—only two months over 8 years."). Yet if a child's

maturity is demonstrably lower than that of most children his age, even a child nearing 12

years of age may be found to lack capacity. *See J.P.S.*, 135 Wn.2d at 39 (11-year-old

9

child was developmentally disabled, "tested at the level of a first grader[,] and had limited cognitive skills").

No evidence was presented that R.C. is intellectually or developmentally disabled. In fact, Mr. Driscoll's report included R.C.'s mother's report that "[R.C.] received all A's and B's for grades." Ex. A at 1.

The fact that R.C. was in the upper end of the 8 to 12 age range, had good grades, the fact that he was self-aware enough to attempt to calm himself down, and the absence of any evidence that he lacked the cognitive ability to understand what an average 10-year-and-7-month-old child understands, all bear on this factor. While not strong support for a finding of capacity, this factor weighs in favor of finding capacity.

*Desire for secrecy.* A child's desire to keep his actions secret suggests he knows the act charged was wrong, supporting a finding of capacity. *Q.D.*, 102 Wn.2d at 27; *J.P.S.*, 135 Wn.2d at 43. Lying about what happened evidences a desire for secrecy. *Linares*, 75 Wn. App. at 417.

R.C. points out that he remained in his mother's room and complied when asked to come out and speak with police. He argues that no evidence was offered that he desired secrecy. But evidence offered at the capacity hearing suggests that when he spoke with police officers, he was both inconsistent and dishonest. He told one officer that he never hit his great-aunt, rather, she hit him; that he merely pushed his foot against his mother's stomach; and that he only walked toward his aunt with a mechanical pencil in his hand.

10

He told another officer that he *did* hit his great-aunt; that she would probably bruise, given her thin skin; but that he did it in self-defense after she slapped him in the face.

Mr. Driscoll's capacity report notes that on earlier occasions when R.C. assaulted his mother, he asked her not to call police out of fear he would be taken to jail.

R.C.'s history of asking his mother not to call police, together with evidence that when police were called in September 2014, he lied, demonstrate a desire for secrecy and a corresponding knowledge that his acts were wrong. The factor weighs in favor of finding capacity.

*Asking the victim not to tell.* A child's request that the victim not tell about the act charged shows the child understands his actions were wrong. *See Q.D.*, 102 Wn.2d at 27.

The State argues that R.C. did not want the police to be called following the September 2014 assaults, but it does not cite to support in the record. We find no evidence that R.C. asked family members not to call police on that occasion, but given the precipitous events, he might not have had the opportunity.

We have already mentioned prior occasions on which R.C. asked his mother not to call police and will not double count that evidence under this factor. This factor does not weigh in favor, or against, finding capacity.

*Prior conduct & consequences (factors 5 and 6 combined).* Evidence that the child has engaged in prior similar conduct and suffered consequences indicates the child knew the conduct was wrong, and supports a finding of capacity. *See Q.D.*, 102 Wn.2d at

11

26-27.

Mr. Driscoll cited prior experience and consequences as the principal reasons for concluding that R.C. had the capacity to understand the acts charged and that they were wrong. The court, too, treated these factors as significant.

Mr. Driscoll's report summarizes R.C.'s prior conduct and consequences as of September 2014:

> [R.C.] has a long history of assaulting his mother, since she took custody of him when he was 8 years old. His mother has stated the police have come to the house at least 3 times due to him beating her up, and that the officers would sit him down and talk to him about his behavior and how it could lead to legal issues and/or jail. The mother reported [R.C.] would always eventually state he was sorry and say he didn't want to do it and would make sure it wouldn't happen again.
>
> ... While in Montana, [R.C.] assaulted his mother twice, with the first time resulting in law enforcement involvement. [R.C.] was cited for the assault and entered into a Diversion-type program with Jefferson County Probation services of Montana. After the second assault, [R.C.]'s Diversion Supervision was extended, and he narrowly avoided Pine Hills Correctional Institute according to his Probation Officer in Montana.
>
> Both [R.C.]'s mother and his Probation Officer from Montana have stated that [R.C.] is well aware of the difference between right and wrong, and has an even better grasp of the potential consequences of assaultive behavior. His mother has stated that [R.C.] said he was, "scared shitless" of going to jail in Montana after his second assault occurred.

Ex. A at 3.

In addressing these factors, R.C. cites his mother's opinion that when he hits family members, it is self-protective because he cannot distinguish between abuse and

12

discipline. Br. of Appellant at 20-21. But this evidence (which was in the context of hitting in response to *physical* punishment) was only presented at the trial, not at the capacity hearing.

He and amici also contend the evidence of his prior similar conduct and consequences was not specific enough to be clear and convincing evidence. We disagree. The court was presented with evidence that by the time of the capacity hearing, R.C. had dealt with law enforcement for assaulting his mother on at least five occasions; that while living in Montana, he suffered the consequence of diversion with county probation services; and that multiple police officers had told him his behavior was wrong and could lead to legal issues or jail. The court was presented with evidence that R.C. was receiving regular counseling for oppositional defiant disorder at Behavioral Health Services of Yakima. This is an extraordinary history of opportunities from which a 10-year-old child with average or better than average cognitive ability could learn what constitutes assault and that it is wrong. This factor weighs strongly in favor of finding capacity.

*Acknowledgment that behavior is wrong.* A child's acknowledgement that his conduct was wrong at the time he engaged in it is evidence of understanding and supports a finding of capacity. *J.P.S.*, 135 Wn.2d at 44. An acknowledgment *after* a child has been taught that his conduct was wrong "is not particularly probative of whether the child understood conduct was wrong at the time it occurred." *Id.* It is verbal acknowledgement

13

of wrongdoing that courts consider under this factor. *See Ramer*, 151 Wn.2d at 116 (considering child's comment that conduct was "kind of sort of wrong"); *J.P.S.*, 135 Wn.2d at 44 (considering child's statement that conduct was "bad").

At R.C.'s adjudication hearing, there was some testimony that he apologized after the assaults on his great-aunt and mother, but that evidence was not presented in the capacity hearing. In announcing its finding of capacity, the trial court identified as relevant to this factor only actions and statements from which one might infer that R.C. knew his assaults were wrong: his being "scared shitless" of going to jail, his trying to calm himself down after the first two assaults, and his lying to police officers about what had happened. RP at 47.

Having considered that evidence in connection with other factors, we do not count it again here. This factor does not weigh for or against a finding of capacity.

Considering all seven factors, the State presented substantial clear and convincing evidence from which the trial court could reasonably find that it overcame the presumption that R.C. lacked the capacity to commit assault.

R.C. and amici nonetheless argue that a child's impulsivity, susceptibility to outside pressures, and capacity for growth and change—qualities that distinguish children from adults—should cause us to modify the seven-factor inquiry or should inform the inquiry in a way they contend it did not in R.C.'s case. They cite to *Bellotti v. Baird*, 443 U.S. 622, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979), *Eddings v. Oklahoma*, 455 U.S. 104,

14

102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), *Yarborough v. Alvarado*, 541 U.S. 652, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004), *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011), and *Miller v. Alabama*, ___ U.S. ___ , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

None of the cases cited has any direct application to the issue of capacity to commit a crime.[2] All discuss current or then-current knowledge about the juvenile brain. We see no reason why the science they discuss could not have been presented in R.C.'s capacity hearing to the extent it was relevant. We have no reason to believe that a superior court judge assigned to juvenile court would not have some knowledge of the science. But its relevance would have been limited to the issue in the capacity hearing: whether R.C. had the capacity to understand the acts charged and know that they were wrong. Where a juvenile has that capacity, our legislature intends that the crimes charged

---

[2] *Bellotti* considered whether a minor has capacity to consent to an abortion without parental consent and is not instructive on the issue at hand. *Yarborough* considered, and *J.D.B.* held, that a person's status as a juvenile should inform whether a reasonable person would have felt free to leave in the court's analysis of whether the juvenile was in custody. The reasonable person standard is not at issue in a capacity hearing, and to the extent it is, the court includes that in the analysis in its consideration of the child's age and maturity. *Eddings*, *Roper*, *Graham*, and *Miller* all addressed the imposition of life sentences or the death penalty on juveniles, and found that because juveniles are less mature, more susceptible to influence, and their character is less fixed than adults, their youth should be a mitigating factor in sentencing. While these cases recognize a distinction between juveniles and adults, none relate to a juvenile's capacity to commit a crime.

15

be adjudicated in the juvenile justice system.

And the juvenile justice system itself reflects the legislature's recognition that a child's criminal act must be addressed differently than the criminal act of an adult. "[T]he fundamental difference between juvenile courts and adult courts" is that, "unlike wholly punitive adult courts, juvenile courts remain[ ] rehabilitative." *State v. Saenz*, 175 Wn.2d 167, 172-73, 283 P.3d 1094, *aff'd*, 175 Wn.2d 167, 283 P.3d 1094 (2012). *Saenz* summarizes a number of respects in which Washington law responds to the fact that juvenile brains, and therefore the juvenile justice response, must be different.

The longstanding seven-factor analysis of capacity remains viable and supports R.C.'s capacity.

## *II. Ineffective assistance of counsel*

R.C.'s other assignment of error is to his trial lawyer's failure to assert self-defense at trial, which he argues amounts to ineffective assistance of counsel. Not only did R.C.'s trial lawyer *not* assert self-defense, he stated at the time of the disposition:

> I'm not trying to justify [R.C.'s] actions[,] because he was out of control that day. I don't think his actions really properly fit into a self-defense mode.

RP at 174. He did argue that "where mitigation is ever something that should be considered, this is the ultimate case for that." *Id.*

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel."

16

*State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). In *Strickland v. Washington*,

466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme

Court held that a defendant's claim that his lawyer's performance was so defective as to

require reversal has two components:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

The claim of ineffective assistance of counsel fails if the defendant fails to prove either

prong. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Because ineffective

assistance of counsel is an issue of constitutional magnitude, it may be raised for the first

time on appeal. *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007).[3]

Courts engage in a strong presumption that counsel performed effectively.

*Strickland*, 466 U.S. at 689. The burden is on a defendant alleging ineffective assistance

of counsel to show deficient representation based on the record established in the

---

[3] While a constitutional error must be manifest in order to fall within RAP 2.5(a)(3)'s exception to the issue preservation requirement, a defendant's demonstration of the second *Strickland* prong satisfies the requirement that the error be manifest. An error is manifest if it actually prejudices the defendant. *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). "'Essential to this determination is a plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999) (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).

proceedings below. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

It is a defense to a charge of assault that the force used was lawful. The use of force is lawful "[w]henever used by a party about to be injured . . . in case the force is not more than is necessary." RCW 9A.16.020(3). The reasonable self-defense standard incorporates both objective and subjective considerations: "the subjective portion requires the jury to stand in the defendant's shoes and consider all the facts and circumstances known to the defendant, while the objective portion requires the jury to determine what a reasonably prudent person similarly situated would do." *State v. Woods*, 138 Wn. App. 191, 198, 156 P.3d 309 (2007) (citing *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993)). Only after the defendant raises credible evidence tending to prove self-defense does the burden shift to the State to prove the absence of self-defense beyond a reasonable doubt. *State v. Graves*, 97 Wn. App. 55, 61-62, 982 P.2d 627 (1999).

R.C. did not testify. His mother testified that "[u]sing physical abuse against [R.C.] makes him . . . aggressive—more aggressive because he's trying to protect himself"—which is why, she added, "I try not to use physical violence to get after him." RP at 107. There is no evidence that R.C.'s mother used any physical discipline before he struck her in the September 2014 incident.

R.C.'s great-aunt testified that when R.C. hit and kicked her, "I think he thought I was going to hit him," adding, "but I wasn't going to hit him." RP at 84.

18

R.C. does not identify any evidence to which his trial lawyer could have pointed in support of argument that R.C. subjectively believed, or a reasonable child would have objectively believed, that he was about to be injured by his great-aunt, mother, and aunt, and responded with *necessary* force.

There was ample evidence that all three women were verbally disciplining R.C. before each assault, that his aunt was yelling and swearing at him, and that she pulled the bucket out from under him—conduct that the trial court recognized was counterproductive and contributed to the escalating situation. But contrary to R.C.'s argument that his great-aunt, mother, and aunt were to blame for all that happened, the trial court attributed the women's conduct to frustration with a damaged and difficult child. It said of R.C.'s great-aunt, "She had had enough. She didn't know how to handle [him]. And this seems to be a common problem where he gets out of control." RP at 158. The court found that it was at the point when R.C.'s mother "just [couldn't] deal with him anymore," that his aunt stepped in, but it described R.C.'s aunt as also "pretty much at the end of her rope," and found that "[e]verybody is reacting because everybody's frustrated and concerned, and they just don't know what to do." RP at 162. The court explicitly found all three women to be credible. From its oral ruling, it is clear that it found their conduct—while unfortunate in some cases—to be understandable. It told the three women at the conclusion of the hearing that, "I got a pretty good picture of what you've been going through with your testimony, and I know that you all care for [R.C.] a lot." RP at 173.

19

The trial court was aware that R.C. did not assault only women in his family. Evidence was presented that he was expelled from the third grade for "punching a police officer and the vice principal." RP at 107.

When R.C.'s trial lawyer told the court, "I'm not trying to justify his actions[,] because he was out of control that day. I don't think his actions really properly fit into a self-defense mode," we can see from the record that he was reasonably anticipating how the trial court was likely to view the evidence. RP at 174. So he relied instead on an argument that merely raising a knife, without making a forward thrust, does not amount to assault.

To commit assault, "[t]he defendant's conduct must go beyond mere threats; there must be some physical action that, under all the circumstances, creates a reasonable apprehension that physical injury is imminent." 13A SETH A. FINE & DOUGLAS J. ENDE, WASHINGTON PRACTICE: CRIMINAL LAW WITH SENTENCING FORMS § 305, at 42 (2d ed. 1998) (citing *State v. Maurer*, 34 Wn. App. 573, 580, 663 P.2d 152 (1983)). Yet "the State need not show a thrusting or pointing of a weapon if other evidence, considered in light of the facts of the incident, raise[s] a factual issue that a defendant's conduct amounts to 'violence begun.'" *Maurer*, 34 Wn. App. at 574-75.

In the end, the trial court found conduct sufficient to be "violence begun." That a defense strategy "ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance

20

No. 32956-9-III
*State v. R.C.*

analysis." *Grier*, 171 Wn.2d at 43. Since R.C.'s trial lawyer's defense theory was a legitimate trial strategy, his performance was not deficient.

Having found no deficient representation, we need not address the issue of prejudice.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

21