# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59625-3-II |
| Respondent, | |
| v. | |
| J.W., | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—JW was found guilty of assault in the third degree with sexual motivation for actions he took when he was 11 years old. He was originally charged with attempted rape of a child in the first degree, and the superior court found that the State had produced clear and convincing evidence that JW was capable of committing that crime, despite his tender age. On appeal, JW argues that we should reverse his conviction because the State produced insufficient evidence to rebut the presumption of incapacity. JW also argues that the State should be required to rebut the presumption against capacity for juveniles between 8 and 12 years old beyond a reasonable doubt for strict liability offenses, rather than by clear and convincing evidence. The State argues that it provided clear and convincing evidence that JW was capable of committing a crime, and that a heightened evidentiary burden would contradict existing case law and hinder the State's interests.

We hold that there was not clear and convincing evidence from which a rational trier of fact could find that JW was capable of committing a criminal sexual act. Because we hold that the State failed to meet this burden, we do not need to reach the issue of whether, as a matter of first impression, the burden of proof for rebutting capacity in strict liability offenses should be beyond a reasonable doubt. Moreover, because JW was not ultimately prosecuted for a strict liability offense, any error in using the clear and convincing evidence standard to determine JW's competency was harmless. Accordingly, we reverse JW's conviction.

FACTS

I. BACKGROUND AND CAPACITY HEARING

JW, born in February 2012, was put into foster care when his biological mother lost her parental rights. JW was in foster care from ages three to seven. JW's mother was a sex worker, and he was "exposed to sexual acts at a very young age." Clerk's Papers (CP) at 5. While in foster care, JW was a victim of sexual abuse.[1] JW was adopted by his biological uncle and aunt when he was eight years old. When JW was 11 years old, he was charged with attempted rape of a child in the first degree. JW finished fifth grade before the beginning of his trial.

About one month after JW's first court appearance, the superior court conducted a capacity hearing to determine whether JW was capable of attempting rape of a child in the first degree. JW's adoptive parents were the only witnesses; JW's attorney tried to obtain an evaluation from

---

[1] JW's parents and JW each characterize this history differently. His mother indicated that JW was exposed to "inappropriate kissing[ and] showing each other private parts" and that "the other child had to be removed from the home." Verbatim Rep. of Proc. (VRP) at 29. His father stated that he had spoken to JW about when he had gotten "fully taken advantage of," and that "the person ended up going to jail and he got separated from that person." *Id.* at 40. The SSODA evaluation states that the abuse happened multiple times, that his abuser was a teenage male, that it happened when JW was about five years old, and that the abuser " 'put his mouth on [JW's] penis.' " CP at 71.

an expert but could not find one who would evaluate a juvenile. JW and the State stipulated to admission of JW's school behavior intervention plan and individualized education program (IEP).

JW's adoptive mother testified that JW did not regularly spend time outside of school with other children. At one point he wanted to have a girlfriend, and his mother had a conversation with him about "boundaries" and "how to act appropriately with a girlfriend." Verbatim Rep. of Proc. (VRP) at 28. She also testified that he is a "pretty good kid" and can excel at schoolwork when he focuses. *Id.* at 30. JW's mother taught JW about personal space and that he needs to ask before giving someone a hug. She did not specify which body parts JW should not touch. JW's mother then described what happened when she saw JW with the victim, RNW.

On the day of the incident, JW and his adoptive sibling, then-five-year-old RNW,[2] were playing in the living room. Their mother noticed that the two children had moved to JW's room and were quiet. She tiptoed to JW's room to check on them and saw JW with his shorts pulled partway down and RNW completely undressed. JW and RNW were in the "[m]issionary . . . position." *Id.* at 33. Their mother said, " 'What the f were you doing,' " after which JW "got scared." *Id.* JW pushed RNW away, pulled up his pants, and stated that he didn't know what RNW was doing or why his pants were down. JW claimed that they were " 'just wrestling.' " *Id.* at 34. On cross-examination, JW's mother testified that JW has an emotional behavioral disability, for which he had not had any counseling since he was nine years old or younger.

The court then heard testimony from JW's adoptive father. He testified that on one occasion, JW and his friend were "showing each other their private parts" and trying to "mess around." *Id.* at 39. JW's father told JW that he was not allowed to touch someone else's private

---

[2] RNW is JW's biological cousin.

parts. JW asked, " '[W]hat if I was married,' " and his father stated that it is okay when someone is older and married, and the touch is consensual. *Id.* JW's father has had "the sex talk" with JW, which JW "appear[ed] to understand," but he did not provide details about what that conversation entailed. *Id.* at 39-40. He also told JW "when stuff is appropriate and when stuff is not appropriate," and that it is not appropriate to kiss girls at his age. *Id.* at 39. JW's father stated that JW knew that his abuser went to jail and knew that what happened to him was wrong. Toward the end of the school year, JW got into a fight at school. JW's father spoke to JW about the incident; JW regretted his actions and apologized to the other child.

JW's father spoke with JW about 8 to 10 minutes after the incident. Before he approached JW, RNW had told their father that his rectum was hurting. JW told his father that they were having sex, and had done so at least 10 times before. JW's father stated that JW knew that what he had done to RNW was wrong because he and JW had "talked about the time that it happened to [JW], and he knew that it was wrong." *Id.* at 43. JW's parents called the police so that JW could "get him the help that he needs." *Id.* at 43. On cross-examination, JW's father indicated that the counseling JW used to receive was intended, in part, to help him cope with his past experiences of sexual abuse. The adoption agency advised JW's adoptive parents that JW have his own bedroom, so that he would not be left alone with other children. This instruction was not due to concerns of sexual issues, but rather of potential violence. As a result, RNW slept in his parents' room.

According to JW's behavior intervention plan, dated May 2023,[3] JW "want[ed] to be a leader and a good friend" and was "constantly seeking friendships and wanting to be a part of groups," but "need[ed] support with peer interactions when he [was] not demonstrating empathy

___

[3] The incident occurred in June 2023.

or patience with a friend." Ex. 1 at 1. He also "struggle[d] to engage with work that require[d] higher sustained stamina and cognitive load." *Id.* Triggers to his behavioral concerns included conflicts (with both peers and adults) and academic expectations. The plan recommended that teachers show JW "self-regulation skills" like taking a break, and involve JW in "social thinking and behavioral reasoning." *Id.*

JW's IEP is also dated May 2023. The attendees at JW's IEP meeting included a behavioral analyst, both his general education and his special education teachers, a clinical psychologist, and his adoptive parents, among others. The IEP states that JW had an emotional behavioral disability and that he had "below average skills in social interactions with other students." Ex. 2 at 7. His emotional behavioral disability hindered "his ability to access his education, develop and maintain relationships with peers, and remain safe to himself and towards those around him." *Id.* He had strong math skills and was reading at grade level, but needed additional support with writing. From May to June 2023, JW spent 50 minutes per day in a special education class called "Collaborative Problem Solving" to help him develop social and emotional skills. *Id.* at 15.

## II. THE SUPERIOR COURT'S RULING AND POST-HEARING PROCEDURAL HISTORY

The superior court determined that the State overcame the presumption of incapacity. The court enumerated the factors it must use in making that decision and found the following facts persuasive: that JW's adoptive parents had multiple conversations with JW about appropriate sexual conduct, JW was closer to the age of 12 than 8 when the incident happened, his intellect was not "significantly lacking," JW had pushed RNW away and pulled his pants up, JW was aware of the consequences his abuser faced, and JW had "indicated" to his father that he knew what he did was wrong. VRP at 61, 63. The court also stated that it "[hadn't] heard a lot about [JW's]

maturity, unfortunately," and that it was unclear whether JW had been punished for the earlier instance of showing his friend his "private parts." *Id.* at 61-62. The court did not believe that the IEP indicated a limited ability for JW to comprehend the nature of the act or its wrongfulness.

After the capacity hearing, the State filed an amended information charging JW with third degree assault with sexual motivation. The superior court found JW guilty on stipulated facts. JW underwent an evaluation by a psychologist and certified sex offender treatment specialist to determine his eligibility for the special sex offender disposition alternative (SSODA), RCW 9.94A.670.

The SSODA evaluation revealed that JW "[was] a rather immature youth with a history of exposure to substantial personal disruption, multiple foster placements, and likely early exposure to sexual conduct by a parent." CP at 75. Given this history and JW's untreated attention-deficit/hyperactivity disorder (ADHD), the examiner was somewhat surprised "that there has not been more extensive early acting out." *Id.* According to the examiner, JW had a "quite limited" understanding of sexual information: he "did not know any proper terms for sexual parts or sexual interactions" or " 'how babies are made.' " *Id.* at 71. In JW's interview with the examiner, he denied using force or threat to initiate sexual conduct with RNW. JW also stated that a friend at school had previously shown him online pornography. The examiner concluded that "the conduct is best explained by developing sexual drive, situational opportunity, reactivity to his own abuse, the presence of an impulse control disorder, and acting out materials viewed on pornographic sites." *Id.* at 75.

The superior court sentenced JW to the SSODA and suspended confinement on the condition that JW complete two years of treatment and probation. JW appeals.

DISCUSSION

JW argues that we should reverse his conviction because the State failed to produce clear and convincing evidence of his capacity to attempt rape of a child in the first degree. He also contends that the burden of proof to rebut incapacity for strict liability crimes should be the "beyond a reasonable doubt" standard instead of the "clear and convincing evidence" standard. Br. of Appellant at 29. The State responds that it produced clear and convincing evidence of JW's capacity and that a higher evidentiary burden would run contrary to the State's interests.

For the reasons explained below, we agree with JW that no rational trier of fact could have found that he possessed criminal capacity by clear and convincing evidence and reverse his conviction. Because we resolve this case on the first issue, we decline to analyze the constitutional issue.

I. JW'S DETERMINATION OF CAPACITY

A. LEGAL PRINCIPLES

A child of at least 8 years and younger than 12 years is presumed incapable of committing a crime. RCW 9A.04.050. This presumption, known as " 'the infancy defense,' " protects " 'individuals of tender years who are less capable than adults of appreciating the wrongfulness of their behavior.' " *State v. Ramer*, 151 Wn.2d 106, 114, 86 P.3d 132 (2004) (quoting *State v. Q.D.*, 102 Wn.2d 19, 23, 685 P.2d 557 (1984)). The State may rebut the infancy defense by proving, through clear and convincing evidence, that the child had "sufficient capacity to understand the act or neglect, and to know that it was wrong" at the time that they committed the act. RCW 9A.04.050; *State v. J.P.S.*, 135 Wn.2d 34, 37-38, 954 P.2d 894 (1998).

The juvenile court determines capacity through a fact-specific inquiry that is "in reference to the specific act charged." *Ramer*, 151 Wn.2d at 114. Courts consider the following factors when determining a child's capacity to commit a crime:

> (1) the nature of the crime; (2) the child's age and maturity; (3) whether the child showed a desire for secrecy; (4) whether the child admonished the victim not to tell; (5) prior conduct similar to that charged; (6) any consequences that attached to the conduct; and (7) acknowledgment that the behavior was wrong and could lead to detention.

*J.P.S.*, 135 Wn.2d at 38-39. It is harder for the State to prove capacity when the child is charged with a crime of a sexual nature. *Id.* at 38. This is due to the difficulty in proving that "the child understood . . . the prohibitions on sexual behavior with other children," especially when the child has a developmental disability. *Id.*

"The standard of review on appeal is whether there was evidence from which a rational trier of fact could find capacity by clear and convincing evidence." *Id.* at 37. The State need not prove that the child understood the specific legal consequences of the act, but "a showing that the child understood her actions were merely morally wrong is insufficient to sustain a capacity finding." *State v. K.A.B.*, 14 Wn. App. 2d 677, 698, 475 P.3d 216 (2020). The child must know that their act was legally wrong, or, in other words, they must be capable of entertaining criminal intent. *Id.* at 697. The testimony of experts and those "acquainted with the child" is relevant to this determination. *J.P.S.*, 135 Wn.2d at 39.

B. APPLICATION

The State argues that it presented clear and convincing evidence to rebut the presumption against JW's capacity. However, the only witnesses who testified at JW's capacity hearing were JW's adoptive parents, who are the biological parents of the victim. Upon consideration of the

evidence using the *J.P.S.* factors, we conclude that a rational trier of fact could not find that the State presented clear and convincing evidence of criminal capacity.

The first factor to consider is whether JW understood the nature of the crime. *Id.* at 38. JW's adoptive father testified that he gave JW "the sex talk," which JW "appear[ed] to understand." VRP at 39-40. However, it is unclear from this statement what information was included in "the sex talk." *Id.* 39. Additionally, neither the IEP nor the behavior intervention plan indicated any sex education to which JW may have been subject. These evidentiary deficiencies are concerning in light of the fact that JW was a victim of repeated sexual abuse by an older teenager while in foster care. Of particular concern in this circumstance is the insufficient evidence showing that JW appreciated that his touching of RNW was sexual in nature as opposed to an ordinary offensive touching. Rape is *sexual* crime, and the State presented little evidence of JW's knowledge of the quality of a *sexual* assault, as opposed to non-sexual assault.

The second factor to consider is JW's age and maturity. *J.P.S.*, 135 Wn.2d at 38. JW was closer to the age of 12 than he was to 8 at the time of the incident. However, as the superior court noted, there was not much evidence indicating JW's maturity, or lack thereof, beyond the IEP. In fact, the IEP and behavior plan indicate that JW was less mature than his peers and required more social and emotional assistance than other children his age. While the SSODA evaluation did not yet exist when the trial court determined JW's capacity, the SSODA evaluation similarly indicates that JW was a particularly immature child, who had trouble with impulse control as a result of his ADHD. This factor weighs against a finding of capacity.

The third factor to consider is whether JW exhibited a desire for secrecy. *Id.* Though it is true that JW immediately tried to deflect responsibility when his adoptive mother discovered him,

she testified that she said " 'What the f were you doing?' " when she walked into the bedroom. VRP at 33. At that point, JW would certainly have realized he was in trouble for doing something wrong, which would naturally lead a child to deflect blame. JW's natural reaction to his mother's statement does not inform the question of whether JW understood the nature or the wrongfulness of his act.

The fourth factor is "whether the child admonished the victim not to tell." *J.P.S.*, 135 Wn.2d at 39. There is no evidence that JW told RNW not to tell anyone else what he was doing. The fifth and sixth factors are previous conduct similar to the relevant act and any consequences resulting from the previous conduct. *Id.* JW told his father that he had sexually touched RNW multiple times before being caught, but there is no indication that JW was punished for previous sexual behavior, such as the instance where he and his friend were "showing each other their private parts." VRP at 39. These factors are not informative as to whether JW possessed criminal capacity.

The seventh factor is whether the child acknowledged the wrongfulness of their behavior and that it could lead to detention. *J.P.S.*, 135 Wn.2d at 39. JW's adoptive father stated that JW "knew what he did was wrong," as JW knew that what JW's abuser had done to him was wrong and that his abuser went to jail for that conduct. VRP at 40, 43. However, the SSODA evaluation indicates that JW's abuser was a teenager, and JW was only 11 years old when he sexually touched RNW. Children often have difficulty discerning the ages of those older than them and understanding what they have in common with older people. The fact that JW knew a teenager was detained for sexually assaulting him as a small child does not support the contention that he understood that what he did to RNW was criminally wrong and could lead to detention. As stated

in *K.A.B.*, 14 Wn. App. 2d at 697-98, the State is required to show that JW acted with criminal intent, i.e., that he understood his actions were more than morally wrong. The evidence presented by JW's adoptive parents does not establish that JW possessed such intent.

In addition to our consideration of the *J.P.S.* factors, we note that although not required in every case, the absence of testimony or evidence from a professional evaluator was particularly concerning in this case. While testimony from those "acquainted with the child" is probative in determining capacity,[4] the lay testimony offered in this case did not demonstrate that JW had the capacity to commit a sexual offense. JW's adoptive parents primarily recounted what happened during the event rather than informing the court about JW's ability to understand the nature and wrongfulness of the act. JW's mother's testimony about JW's reaction when he was discovered with RNW must be viewed within the context of her conduct in exclaiming " 'What the f were you doing?' " when she opened the door.[5] A child confronted with a parent saying " 'What the f were you doing?' " would certainly and instantly know they are in trouble, but this does not demonstrate that the child is capable of harboring criminal intent.

Again, although not required in every case, medical experts and other professionals who can speak to the child's understanding of the nature of the act and its wrongfulness are especially valuable. For example, in *Ramer*, 151 Wn.2d at 110, the defense presented testimony from both a forensic psychologist and a mental health specialist who performed "safe to be at large" evaluations. Neither the forensic psychologist nor the mental health specialist thought that 11-year-old Ramer understood the act of "having sexual contact with a much younger child" or that it was

---

[4] *J.P.S.*, 135 Wn.2d at 39.

[5] VRP at 33.

11

wrong. *Id.* at 109, 111. The State called the detective who interviewed Ramer and a juvenile court probation counselor who had several conversations with Ramer. *Id.* at 110-11. The supreme court held that the State failed to prove that Ramer had capacity to commit first degree rape of a child. *Id.* at 109, 117. It stated that the only witness who opined that Ramer had capacity was the juvenile probation officer, who did not evaluate Ramer. *Id.* at 117. The *Ramer* court's holding highlights the probative value of expert evaluations in determining juvenile capacity, especially considering the unique difficulty of proving capacity in sex crime cases.

Additionally, schoolteachers and administrators with knowledge of the child's abilities and the school's sex education program have testified at capacity hearings. In *J.P.S.*, 135 Wn.2d at 39-40, the superior court heard from J.P.S.'s fifth grade teacher and assistant principal, among other witnesses. J.P.S.'s teacher testified that J.P.S. spent three periods per day in special education classes, that she taught him first or second grade level material, that he did not have discipline issues, and that the boys in her class learned about human sexuality from the assistant principal. *Id.* at 40-41. The assistant principal testified that he never taught J.P.S., but that he taught about human reproduction instead of the "social interaction dealing with boy/girl relationships." *Id.* at 41. He also stated that based on psychological reports, J.P.S. had "limited cognitive skills." *Id.* A police sergeant, a county probation officer, the alleged victim's father, and J.P.S.'s mother also testified. *Id.* at 39. The supreme court held that the State did not prove that 11-year-old J.P. had capacity to commit first degree rape of a child because "[t]he record reflects no prior training or education of J.P. about sexually prohibited behavior," "[i]t shows J.P. had never previously been in trouble for any sexually inappropriate conduct," and that "J.P. has limited cognitive ability." *Id.* at 36, 44.

School personnel also testified in *State v. Erika D.W.*, 85 Wn. App. 601, 934 P.2d 704 (1997). The State charged Erika with first degree child molestation, which allegedly occurred a few months before she turned 12 years old. *Id.* at 603-04. At Erika's capacity hearing, the superior court heard testimony from Erika's fifth grade teacher, her school principal, one of Erika's babysitters, and a neighbor who the alleged victim had first told. *Id.* at 604. Erika's teacher testified that Erika was academically successful and got along well with her peers. *Id.* The teacher was unaware if Erika had taken the courses on "good touch/bad touch" from lower grades, and relayed that she taught "human sexuality, which covered human development, family, sex roles, friendship, sexual exploitation, the reproductive system and AIDS." *Id.* The teacher only discussed sexual intercourse if a student asked about it. *Id.* The court of appeals reversed the superior court's finding of capacity, stating that "[t]here was no testimony that [Erika] had learned anything about sexual desire" and that the evidence was insufficient to prove that Erika understood the gravity or illegality of her conduct. *Id.* at 606-07.

Each child's situation differs greatly, and the capacity test is fact-intensive by nature. However, expert testimony and testimony from a breadth of adults familiar with the child is important in gaining a full picture of the child's capacity, and this court has previously noted the absence of such testimony.[6] *State v. K.R.L.*, 67 Wn. App. 721, 726, 840 P.2d 210 (1992) (holding that an eight year old charged with burglary was not capable of committing the crime and stating that "there was no expert testimony in this case from a psychologist or other expert who told the

---

[6] In *State v. Cruz*, No. 86263-4-I, slip op. at 1 (Wash. Ct. App. Sep. 2, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/862634.pdf, Division One held that the superior court used the wrong legal standard in evaluating Cruz's capacity and remanded for reconsideration of capacity. It also stated that the court could consider additional evidence on remand, "[g]iven the lack of any live testimony, including expert testimony." *Id.* at 1.

court anything about the ability of K.R.L. to know and appreciate the gravity of his conduct"). *See also State v. Linares*, 75 Wn. App. 404, 407, 416, 880 P.2d 550 (1994) (holding, in a consolidated case, that Pam did not have capacity to commit malicious mischief, as only the arresting officer testified at Pam's capacity hearing).

The lay testimony that was presented by interested parties in this case, absent additional evaluations that offer insight into JW's capacity to possess criminal intent, was insufficient to overcome the presumption that JW lacked the capacity to commit attempted rape of a child in the first degree. Given the greater challenge of determining capacity in cases involving sex crimes and the minimal evidence produced at the superior court, we hold that no rational trier of fact could have found, by clear and convincing evidence, that JW had capacity to commit a criminal sexual assault.[7]

## REMEDY

Although multiple appellate cases reverse superior court findings of capacity, they lack clarity as to the appropriate remedy. *State v. James P.S.*, 85 Wn. App. 586, 594, 934 P.2d 698 (1997) (reversing and dismissing), *aff'd*, *J.P.S.*, 135 Wn.2d at 44 (affirming the court of appeals' reversal of the capacity finding); *Erika D.W.*, 85 Wn. App. at 607 (reversing and dismissing); *State v. Linares*, 75 Wn. App. at 417 (reversing the disposition). We have held that when the superior court commits a procedural error in failing to conduct a capacity hearing before convicting a

---

[7] We note that arguably, the trial court should have conducted a second capacity hearing after the State amended its charge to assault in the third degree with sexual motivation. To prove sexual motivation, the State must show that the respondent took the action "for the purpose of [his] sexual gratification." Former RCW 13.40.020(34) (2021). The crime for which JW was originally charged, attempted rape of a child in the first degree, does not require such a showing. However, had JW raised this argument, our holding with regard to the sufficiency of the evidence for JW's capacity would apply to the new charge with equal force, if not more so.

juvenile who is rebuttably presumed incapable, the appropriate remedy is to conduct a capacity hearing. *State v. A.X.K.*, 12 Wn. App. 2d 287, 294, 457 P.3d 1222 (2020). Then, "[i]f the court determines that [the child] did not have the capacity to commit the charged offense, the adjudication must be dismissed." *Id.* at 290. In the context of sufficiency of the evidence, conversely, the remedy when the State fails to meet its evidentiary burden regarding an element of the crime is reversal of the conviction with an order to dismiss the case with prejudice. *Q.D.*, 102 Wn.2d at 21.

In *A.X.K.*, the respondent was found guilty of attempted rape of a child in the first degree, which allegedly occurred before he reached the age of 12. 12 Wn. App. 2d at 290. A.X.K. argued that the court of appeals should reverse his adjudication because the superior court never held a capacity hearing. *Id.* We disagreed and analogized A.X.K.'s case to *Dillenburg v. Maxwell*, 70 Wn.2d 331, 422 P.2d 783 (1967). *Id.* at 296. In *Dillenburg*, the petitioner pleaded guilty in superior court to a crime committed when he was 16 years old, after the juvenile probation officer declined juvenile court control over Dillenburg without a formal hearing. 70 Wn.2d at 349. The *Dillenburg* court held that remand to the superior court for a de novo hearing was the appropriate remedy. *Id.* at 355. At this de novo hearing, the superior court was to determine "whether the facts before the juvenile 'session' of the superior court in the first instance warranted and justified the transfer for criminal prosecution." *Id.* The *A.X.K.* court concluded that the remedy from Dillenburg applied to A.X.K., and that it needed to "determine if the court had authority to [convict A.X.K.]" before his conviction could be overturned. 12 Wn. App. 2d at 296.

Though remand for a capacity hearing may have been an appropriate remedy in *A.X.K.*, we hold that it is inappropriate for JW's case. The JW court has already conducted a capacity hearing

which met procedural requirements. The State had an opportunity to present sufficient evidence to rebut the presumption of JW's incapacity and failed to do so. It makes little sense to remand this case to give the State another opportunity to produce evidence it had the full opportunity to produce at the original capacity hearing. Moreover, the passage of time will make it difficult for a professional evaluator to give an opinion on JW's capacity for an act committed when he was 11 years old. Accordingly, we reverse JW's conviction and order that it be dismissed with prejudice.

## II. PROCEDURAL DUE PROCESS AND THE "CLEAR AND CONVINCING" STANDARD

Because we resolve JW's appeal on the first issue, we decline to address whether the "clear and convincing evidence" standard is sufficient to rebut the presumption of incapacity for juveniles between the ages of 8 and 12 who are charged with strict liability crimes. *State v. Houston-Sconiers*, 188 Wn.2d 1, 18 n.3, 391 P.3d 409 (2017) ("[W]e generally avoid constitutional questions when the case can be decided on nonconstitutional grounds.").[8]

## CONCLUSION

Based on the evidence presented at the superior court, we conclude that no rational trier of fact could have found, by clear and convincing evidence, that the State rebutted the presumption

---

[8] We note, however, that the supreme court has applied the "clear and convincing evidence" standard to multiple juvenile cases involving strict liability sex offenses after determining that the "clear and convincing evidence" standard was the correct standard in *Q.D.*, 102 Wn.2d at 26; *Ramer*, 151 Wn.2d at 113 (applying the standard to a charge of first degree rape of a child); *J.P.S.*, 135 Wn.2d at 37 (also applying the standard to a charge of first degree rape of a child). Although we have found no case in which an appellant has made the particular argument JW makes in this case, we are bound by this standard.

that JW lacked the capacity to be held criminally liable for the act committed in this case. Accordingly, we reverse JW's conviction.[9]

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

MAXA, J.

PRICE, J.

---

[9] Following oral argument, JW submitted a motion for leave to file supplemental briefing. In light of our resolution of this case, that motion is denied.